**ALLEGHENY LUDLUM STEEL CORPORATION, Petitioner,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (MALO-BICKY), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 8, 1999.

Decided June 6, 2000.

Michael A. Cohen, Pittsburgh, for petitioner.

Daniel K. Bricmont, Pittsburgh, for respondent.

Before COLINS, J. ,FLAHERTY, J., and NARICK, Senior Judge.

FLAHERTY, Judge.

Allegheny Ludlum Steel Corporation (Employer) petitions for review from an order of the Workers' Compensation Appeal Board (Board) which affirmed in part the Workers' Compensation Judge's (WCJ) decision that granted Kenneth Malobicky's (Claimant) reinstatement petition and reversed in part the WCJ's decision that granted Employer credit for past disability payments to Claimant. We affirm in part and reverse in part.

The WCJ found that on July 9, 1988, Claimant sustained work-related compensable injuries, which consisted of a deep laceration to the left side of his neck where it meets the shoulder and a second-degree burn to his right arm.[1] Employer issued a notice of compensation payable dated July 18, 1988, under which Claimant was paid temporary total disability. Claimant did not return to his pre-injury bid job as a gauger, but returned to work as a strip mill recorder, which he was doing at the time of injury. Claimant and Employer executed various supplemental agreements in years that followed under which Claimant was paid for total and/or partial disability. The first supplemental agreement was dated September 6, 1988 and the last agreement was dated November 4, 1990, when Claimant's benefits of temporary total disability were suspended when he again returned to work at wages equal to or greater than his wages at the time of his injury, but with an undetermined amount of disability to his left shoulder and arm. As a strip mill recorder Claimant mostly operated a keyboard that required minimal manual labor and did not require use of the left arm.[2]

While working under the terms of the supplemental agreement of November 4, 1990, Claimant filed the instant reinstatement petition on or about March 16, 1994, alleging the complete loss of use of his left arm for all practical intents and purposes as of February 22, 1994, caused by the work injury of July 9, 1988.[3] Employer

---

**1.** The second degree burn to Claimant's arm is not at issue in this appeal.

**2.** Claimant is right handed, so it is his non-dominant arm which is involved in this injury.

**3.** Claimant's reinstatement petition was filed pursuant to Section 408 of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 732. The petition alleged the complete loss of use of his left arm

filed an answer denying Claimant's allegations.

Claimant testified at the hearings that he has no limitations with his left arm from his elbow down to the fingers on his left hand, but that he does have limitations with his left shoulder. He cannot lift his left arm overhead and can only lift the arm out from his side approximately two to three inches. He cannot lift his arm straight out in front of him more than a few inches or put his arm behind him. Claimant indicated that he has no strength in his left arm and that he has pain from the base of his neck across his chest and shoulder in a circular fashion and that he has numbness in this same area. Claimant testified that in everyday activities he cannot do any overhead work, although he can bathe and dress himself.

Dr. Eric Minde (Dr. Minde) examined Claimant on February 22, 1994. He testified on Claimant's behalf that, based on his examination, the medical records and the reports of other physicians, Claimant sustained a work injury to his neck and left shoulder area which required surgery.[4] The surgery included repair of a deep laceration of the neck, lacerations of the scalenus medius muscle, posterior levator scapula and trapezius muscles, as well as a laceration to the accessory nerve.[5] Due to these lacerations, Claimant now only has the ability to bring the left arm away from the body ten percent of normal. Claimant's arm is basically in a non-functional position and, because of the injury, Claimant has a drop shoulder appearance on the left side. Dr. Minde stated with a reasonable degree of medical certainty that Claimant had lost the use of his upper left arm for all practical intents and purposes since a person with no function of the shoulder cannot stabilize his arm, and that the Claimant cannot position and stabilize the arm to do any activity with it.[6] Dr.

pursuant to Section 306(c) of the Act which states:

> For all disability resulting from permanent injuries of the following classes, the compensation shall be exclusively as follows:
>
> ....
> (3) For the loss of an arm, sixty-six and two-thirds per centum of wages during four hundred ten weeks.
> ....
> Where, at the time of the injury the employe receives other injuries, separate from these which result in permanent injuries enumerated in clause (c) of this section, the number of weeks for which compensation is specified for the permanent injuries shall begin at the end of the period of temporary total disability which results from the other separate injuries, ....
> 77 P.S. § 513(3).

4. The only reference in the record relating to the original disability resulting from Claimant's left arm is Dr. Minde's description of the history he received from Claimant:

> He advised the following as far as his work: he lost two months of work initially. He returned to work in the office setting for two months, and then back in the mill and production control. But this was actually a clerical type position. (R.R. 21.)

....
> He was off a month for therapy. And then was placed in a scheduling position, going back into the mill for doing scrap activities. He said he would have help of other personnel and would only use one arm. (R.R. 22.)

5. Specifically, Dr. Minde testified:

> These muscles [the scalenus medius, levator scapula and trapezius] together are important for holding everything together between the neck, shoulder, thorax and even the upper back and providing the integrity so that you can mobilize these areas to use the shoulder probably [sic properly].
>
> In other words, if those muscles are not functioning, things are not holding together there as they should. The shoulder is not functioning properly. (R.R. 27.)
>
> Now, the accessory nerve is involved with ... the total integrity and function of the neck, shoulder, upper back, and thorax together and how that stabilizes that area. (R.R. 28.)

6. Dr. Minde stated:

> What I'm saying here is that the shoulder isn't even in the right place. He can't control the place the shoulder is in. Of course this is the key to the function of the arm. If you can't control the place the shoulder is

Minde opined that the cause of the loss of use of the left arm is the specific work injury of July 9, 1988 and that the loss of use is permanent.

Although the obvious injury was to Claimant's neck and that part of the left shoulder area where the laceration occurred to the muscles and nerves, Dr. Minde considered Claimant's injury to be anatomically involved with the function of the left arm, even though anatomically the neck and left shoulder laceration area is beyond the left arm that is involved in the injury.[7]

Dr. John J. McCarthy III (Dr. McCarthy) testified on behalf of Employer concerning his examination on September 13, 1994. Dr. McCarthy opined that, based on the fact that Claimant still had normal motion, muscle strengths, sensations and function of the hand all distal to the shoulder, that he had not lost the use of his left arm "for all intent and practical purposes" [sic] and that Claimant's left arm is totally functional when it is at his side up until the point of extending the arm. Dr. McCarthy opined that ninety percent of daily activities are performed with the arm at the side and very few activities are performed with the arm above shoulder level. Based upon this he believed that Claimant is able to function very well with his arm at his side. (Deposition of Dr. McCarthy, pp. 10–13.)

The WCJ specifically rejected the testimony of Dr. McCarthy and accepted as credible the testimony of Claimant and Dr. Minde. The WCJ found that Claimant had sustained the permanent loss of use of his left arm for all practical intents and purposes as a result of the work related injury of July 9, 1988, entitling the Claimant to specific loss benefits from November 4, 1990, the date compensation had been suspended. Both parties appealed to the Board which affirmed the finding of a specific loss but reversed the WCJ's determination that Employer was entitled to a credit because there had only been one injury resulting in the specific loss. The Board's reversal was based on its conclusion that the specific loss was separate and apart from the original disability, so the Board denied Employer a credit for the previous total disability payments paid in the sum of $15,613.89 during various periods of disability. Employer now appeals.

Employer raises two issues for our review: whether the finding of the WCJ that Claimant sustained a complete loss of use of his left arm for all practical intents and purposes as a result of the July 9, 1988 work injury is supported by substantial evidence and, if that finding is supported,

---

in, then you can't show function of the entire arm. The shoulder is the basis for the support of the arm. (R.R. 41, 42.)

When Dr. Minde was asked why he was of the opinion that Claimant had lost the use of the entire left arm, he stated:

A. Yes. There are actually two ways to look at this. Basically just on a functional capacity basis, a person with no function of the shoulder that cannot stabilize his arm, essentially has loss of use of the arm.

Q. Why?

A. The key to the use of the arm is the stability of the shoulder. If you do not have stability of the shoulder, you have no control of the position of the arm. You do not have use of your arm. Anything you would try to do, even with the hand, which itself is functioning, you can't stabilize the arm to do it. (R.R. 46.)

7. On cross-examination, Dr. Minde stated:

A. The reason I'm going to explain this a little bit is there are two shoulder joints. There is a scapula thoracis, which is where the scapula comes against the thoracic cage. And the glenohumeral, which is where the humerus bone fits into the glenoid process, which is part of the scapula.

Technically, the scapula thoracic is part of the trunk; not part of the arm. When you get to the glenohumeral, this is actually part of the arm. In the glenohumeral joint that is being talked about, we cannot say the glenohumeral joint is above the arm because it's actually part of the arm.

Q. The humerus extends into that joint?

A. The humerus makes up part of that joint. So that's why I want to explain it that way. So one cannot say the shoulder is per se above the arm or that this man's problem situation is higher than the arm. That's the reason why, because of the anatomy. (R.R. 64.)

whether Employer is entitled to credit for all disability benefits it had already paid to Claimant before the injury resulted in a specific loss.[8]

■ In a case where loss of use of an extremity is in question, it is the party seeking to establish a specific loss that must show that he has suffered the permanent loss of use of the injured part of his body for all practical intents and purposes. *Klaric v. Workmen's Compensation Appeal Board,* 71 Pa.Cmwlth. 91, 455 A.2d 217 (1983). The issue of loss of use of an extremity is a question of fact for the WCJ to resolve. *Id.* at 218. We are precluded in our appellate role from re-weighing evidence or substituting our credibility determinations for those of the WCJ. *Hills Department Store # 59 v. Workmen's Compensation Appeal Board (McMullen),* 166 Pa.Cmwlth. 354, 646 A.2d 1272 (1994).

Employer argues that the evidence of record does not contain substantial evidence to support the finding that Claimant sustained a loss of use of his left arm for all practical intents and purposes as a result of the work injury to his shoulder. Employer argues that a specific loss of use of the left arm cannot be awarded where the injury is to the neck and shoulder unless the party with the burden establishes that a change took place in the neck and shoulder condition to include the left arm. Employer's reliance on *Motor Freight Express v. Workmen's Compensation Appeal Board,* 59 Pa.Cmwlth. 415, 429 A.2d 1272 (1981), in support of its argument is misplaced. In *Motor Freight,* the initial medical report was limited to a diagnosis of a total disability confined to the left shoulder. The employer's only evidence in support of its modification petition was a report from its medical expert, dated after the suspension agreement, which report added to the original diagno-

sis a new diagnosis of a 100% permanent loss of use of the left arm for the first time without containing even a description of any physical findings in support of the diagnosis and without a reexamination of the claimant after the initial examination. *Motor Freight* simply held that the second report was properly rejected by the referee who concluded that there was no credible proof that the original total disability of the left shoulder had changed or otherwise resolved itself into a specific loss left arm injury.

Employer's argument stressing that a left shoulder injury cannot later be connected to a specific loss of the left arm was specifically rejected in *HGO, Inc. v. Workmens' Compensation Appeal Board (Hadley),* 651 A.2d 719 (Pa.Cmwlth.1994). In *HGO,* the claimant initially suffered a left shoulder injury, received total disability benefits until executing a suspended agreement and later was awarded benefits for the specific loss of use of the left arm.

Here, Claimant and Dr. Minde provided detailed testimony about the left arm, which the WCJ found credible, that while Claimant could use his left fingers, hand and arm from the elbow down, if the arm was in a low position, he still had serious limitations. Further, Dr. Minde testified unequivocally with a reasonable degree of medical certainty that, as a result of his injury of July 9, 1988, Claimant has lost the use of his left arm for all practical intents and purposes as a person with no function of the shoulder cannot stabilize his arm.

■ In the instant case, the WCJ found that Claimant and his physician provided credible evidence that the shoulder injury sustained by Claimant has caused him the loss of use of his left arm. We conclude that the WCJ and the Board's finding that Claimant had a specific loss of use of his left arm for all practical intents

**8.** Our appellate review in workers' compensation cases is limited to determining whether findings of fact are supported by substantial evidence, whether constitutional rights were violated and whether errors of law were committed. *NGK Metals Corporation v. Workmen's Compensation Appeal Board (Bochis),* 713 A.2d 127 (Pa.Cmwlth.1998).

and purposes is supported by substantial evidence. While Claimant still has limited use of his fingers, hand and lower arm, a body part need not be of absolutely no use in order for there to be a loss of use for all practical intents and purposes. The issue of loss of use is a question of fact for the WCJ to resolve. *Bakula v. Workmen's Compensation Appeal Board (Budd Company)*, 134 Pa.Cmwlth. 37, 577 A.2d 961 (1990). Accordingly, because the findings of the WCJ are supported by substantial evidence, the order of the WCJ and Board granting Claimant specific loss of use benefits is affirmed.

Next, Employer argues that if the Court concludes, as it does, that Claimant is entitled to specific loss of use benefits, then the Board erred as a matter of law in reversing the WJC's award of credit of $15,613.89 to Employer for disability benefits that it had already paid to Claimant for his work injury. We agree.

■ In cases of specific loss claims, the well established rule is that an employee who sustains an injury adjudged compensable under Section 306(c) of the Act, is not entitled to additional compensation beyond that provided by Section 306(c), even though he may be totally disabled by the injury. *Truck Lubricating & Washing Company v. Workmen's Compensation Appeal Board (Durr)*, 54 Pa.Cmwlth. 495, 421 A.2d 1251 (1980). The Board held that the exception to this general rule should be applied, however, which is that a claimant is entitled to total and partial disability benefits under Sections 306(a) and (b), respectively, in addition to benefits for a specific loss when he proves there is a destruction, derangement or deficiency to a separate and distinct part of his body that did not follow as the normal result of the specific loss. *Czap v. Workmen's Compensation Appeal Board (Gunton Corporation)*, 137 Pa.Cmwlth. 612, 587 A.2d 49 (1991).

■ Where only one injury occurred, as is the case here, we must examine the facts to see if the disability to Claimant's shoulder was separate and distinct from the disability caused by the loss of use of Claimant's left arm to determine if Claimant is entitled to both disability and loss of use benefits. *See BCNR Mining Corporation v. Workmen's Compensation Appeal Board (Hileman)*, 142 Pa.Cmwlth. 588, 597 A.2d 1268, 1271 (1991). If for instance, the permanent loss of use of the arm is not a separate and distinct disability from the neck/shoulder injury, the disability payments previously received by Claimant under Sections 306(a) and (b) for total and partial disability respectively will be credited to Employer. *Bausch v. Fidler*, 277 Pa. 573, 121 A. 507 (1923).

In *Bausch*, the claimant fell from a roof injuring his left arm, right leg and right wrist. He received disability benefits for 17 weeks and thereafter filed a claim for specific losses of the arm and leg and for partial disability for the right wrist. In construing Section 306 which governs specific losses the court stated:

> At first the extent of claimant's injuries was not known. When it appeared he was to have a permanently paralyzed arm and a permanently stiff leg, with no hope of their recovery or of alleviating that condition, he was entitled to an order for their loss ... under paragraph (c) [of Section 306].
>
> . . . .
>
> When the status of the two major injuries was definitely determined under the term 'all disability,' the compensation related back to the first payment; what had been previously paid, awaiting the ascertainment of Claimant's final status, would be deducted from the award under [Section 306] paragraph (c) ... "[W]here a temporary injury lapses into a permanent one, causing total loss of the member, the final award comprehends all compensation as a direct result of the injury, including the time under

treatment." Lente v. Luci, 275 Pa. 217, 119 A. 132 (1922).

277 Pa. at 575, 121 A. at 508.

In finding that the disability to Claimant's shoulder was separate and distinct from the disability caused by the loss of use of the left arm, the Board pointed out that the WCJ specifically found the testimony of Dr. Minde to be credible. The WCJ found that Claimant lost the use of his left arm for all practical intents and purposes and also concluded that the loss of use of the left arm resulted in a disability which is not separate and distinct from that which normally follows the type of deep laceration shoulder injury incurred by Claimant because Dr. Minde also testified that the lacerated muscles and nerves of the neck and left shoulder were all anatomically involved and cooperated to produce the functional loss of the arm.

In *HGO*, the claimant produced competent evidence of a change with evidence that his condition deteriorated after the suspension agreement, his range of motion had decreased and his pain increased. Unfortunately, this record is devoid of any proof of a change in Claimant's condition from the time of injury. Although Dr. Minde diagnosed a work-related specific loss of use of the left arm, he did not examine Claimant until five years after the initial injury and provided no proof of any change in condition. In fact, the only reference in the entire record to Claimant's original condition is Claimant's history to Dr. Minde that after he returned to work, he only had the use of one arm (R.R. 22), which is the same condition existing at the time of the WCJ's hearing when Claimant testified that his left arm "lost a lot of strength" since the injury. (R.R. 10.) Unlike *HGO*, there is no proof of deterio-

ration here, no proof of any change in condition because there is no description of the original condition showing that after the injury there was some use of the arm which was apparently never lacerated or the recipient of any direct trauma. Such usage would provide some basis for comparison with the specific loss of use existing over five years later at the time of Dr. Minde's examination and prove some change showing a significant deterioration had occurred. In addition, Dr. Minde, while acknowledging that the arm and the laceration area are anatomically separate, clearly connects, for functional purposes, the loss of use of the arm to the lacerated muscles and nerves in the neck region of the shoulder by testifying they are all anatomically related to the movement of the arm.[9]

■ Based upon the entire testimony that the WCJ specifically found credible, we must conclude that, although Claimant proved the loss of use of his left arm, Claimant did not meet his burden of proving that he had a disability in his shoulder that was a separate and distinct disability from that of the loss of use of his left arm. There was substantial evidence for the WCJ to conclude that the specific loss of use of the left arm was not a separate and distinct disability from the disability caused by the neck/shoulder injury.

Since Claimant has sustained only one disability, Employer is, therefore, entitled to a credit for the previous indemnity compensation payments made to the Claimant of $15,613.89 against the specific loss award. In summary, that part of the Board's order of July 21, 1998 dismissing Employer's appeal and its determination that Employer is not entitled to any credit

---

9. On re-direct examination, Claimant's attorney asked Dr. Minde:

Q. ...The actual trauma itself, did that occur to parts of the anatomy that are separate and distinct from the arm itself in terms of the area of the trauma.

A. If you are talking about the anatomy, and we use the definition that we have

developed into today's discussion that the arm begins at the shoulder level where the glenohumeral joint is, then I would have to say anatomically there are areas beyond the arm that are involved in the injury.

Again, the way I initially looked at the case is that those things are all involved with the function of the arm (R.R. 86.)

for past disability payments to Claimant is reversed and the decision of the WCJ is reinstated.

Accordingly, that part of the order of the Board concluding there was a separate and distinct disability and reversing the WCJ's grant of credit to Employer is reversed and Employer is granted credit for disability payments already paid to Claimant. The order is otherwise affirmed and the order of the WCJ reinstated.

## ORDER

AND NOW, June 6, 2000, the order of the Workers' Compensation Appeal Board, No. A95–2477, dated July 21, 1998, is affirmed in part, reversed in part and the decision of the WCJ is reinstated.